# CITY OF ST. LOUIS v. BROWN et al.; COLLINS REALTY COMPANY, Appellant.

## Division One, March 30, 1900.

1. **Municipal Corporation:** CONDEMNATION PROCEEDINGS: EXPEDIENCY. Where the condemnation of private property is undertaken for a use alleged to be public, the courts will decide whether or not the suggested use is in fact a public one. But where there is no question as to the public character of the use, such as that resulting from widening the streets of a city, it is not for the courts, but for the legislative and executive departments of the municipal government, to determine whether or not in the instance proposed it is politic or expedient to exercise the power of condemnation.

2. ———: ———: OBJECTIONS TO COMMISSIONER. One who appeared before the mayor of a city on behalf of a property owner for the purpose of using his influence in procuring the veto of an ordinance for the widening of a street, was not, on that account, disqualified to serve as a commissioner in condemnation proceedings subsequently instituted under said ordinance.

3. ———: ———: ———: WHEN TO BE URGED. Where parties have valid objections to a commissioner in condemnation proceedings they should urge such objections as soon as possible, without waiting to see the result of the commissioner's judgment.

4. ———: ———: CITY OF ST. LOUIS: APPORTIONMENT OF DAMAGES. Under the charter provisions of the city of St. Louis, and ordinances conforming thereto, commissioners in proceedings for improving

VOL. 155 mo—35

streets are required to apportion the burden of damages to private property between the city and the owners of property especially benefited by the proposed improvement, and to that end are also required to define and establish a district embracing all property so benefited, first giving notice by publication of the boundaries of said district, and of the time and place of their meeting to assess such benefits, and to hear complaints. *Held*, that the commissioners after holding such meeting had authority to reduce the size of a district as originally marked out by them, at any time before completing and filing their final report.

5.  ————: PUBLIC IMPROVEMENTS: LIABILITY OF PUBLIC PROPERTY TO SPECIAL ASSESSMENT. It is 'competent for the law-making power to include public property belonging to a city or county within the limits of special assessments for public improvements, but such property is not so included unless done by express enactment, or by clear implication; and where the remedy provided by law for the collection of the tax is inapplicable to the case of public property, the courts must conclude that the law-makers did not intend public property to be affected by such assessments.

6.  **Condemnation Proceedings:** MEASURE OF DAMAGES. Under an ordinance for widening a public street, the city of St. Louis appropriated 35 feet of a lot upon which the owner had commenced to excavate preparatory to erecting a large mercantile building, which had been contracted in advance to reliable tenants. In order to conform to the new line of the street said lot owner moved the site of his building back, thereby taking off one-half of another lot having an original frontage of 70 feet. In estimating the damage sustained by said lot owner, *held*, that the commissioners properly awarded him not only the value of the land actually taken for the street, but also the expense of moving the site of his building, the loss occasioned by the delay in completing his house, and the impairment in value of the adjoining lot consequent upon the reduction of its size.

7.  ————: COMMISSIONERS' REPORT: INTERFERENCE BY COURT. On a mere question of value depending on conflicting evidence the circuit court should hesitate to interfere with the commissioners' findings, although in a proper case it has undoubtedly the right to do so.

8.  **Constitutional Question:** POINT NOT RAISED IN TRIAL COURT. The point that an ordinance authorizing condemnation proceedings violates the Constitution of the United States, will not be considered on appeal, where no such point was included in the exceptions filed in the circuit court to the report of the commissioners.

Appeal from St. Louis City Circuit Court.—*Hon. P. R. Flitcraft*, Judge.

AFFIRMED.

*Noble & Shields, Boyle, Priest & Lehmann, Lon O. Hocker, Valle·Reyburn, Bryan, Richards & Rozier, John H. Drabelle* and *Collins, Jamison & Chappell* for appellants.

(1)  Commissioner Hemmelmann was not disinterested. Randolph Law Eminent Domain, secs. 320 and 324; Falmar v. Falmar, 68 Ala. 120; Railroad v. Townsend, 36 Hun. 630; In re Buffalo, etc., 32 Hun. 289; Michigan Air Line v. Barnes, 40 Mich. 383; Railroad v. Howard, 20 Mich. 18; Antony v. S. Kensington, 13 R. I. 129; Petition for Highway, etc., 48 N. Y. 433; Railroad v. Lynch, 23 Ill. 597; Powers v. Bears, 12 Wis. 213; Eples v. Nieman, 5 Ind. 459; Kundinger v. City Saginaw, 59 Mich. 355; 6 Am. & Eng. Ency. Law, Eminent Domain, 617; Lewis, Eminent Domain, sec. 405; State ex rel. v. Hocker, 25 Law R. A. 114; Cooley's Const. Lim., 649, 694, 695; 12 Am. & Eng. Ency. Law 352; Thompson & Merriam Juries, sec. 185; 7 Ency. Plead. and Prac., p. 559; Albany Street Opening, 6 Abs. Pr. (N. Y. Sup.) 273; 3 Black on Judgments, sec. 283.  (2)  The district established by the commissioners could not be changed, and a new district established without notice. City Ordinances, sec. 675, page 740, Revised Ordinances, City of St. Louis, 1892; Shaffner v. St. Louis, 36 Mo. 264; Lynn v. Clemens, 44 Mo. 540; Orrick School District v. Dorton, 125 Mo. 439; City of St. Louis v. Ranken, 96 Mo. 497.  (3)  The real estate owned by the city, including that leased to L. H. Bohle, being within the district established, should have been assessed benefits. City of Clinton v. Henry Co., 115 Mo. 557; Charter of St. Louis, article 6, sec. 5, and article 8, sec. 675, Revised Ordinances, 1892; Thornton v. City of Clinton, 50

S. W. Rep. 295; Kansas City v. Bean, 147 Mo. 259; In re Extension Church St., 49 Barb. 455; Chicago v. Baer, 41 Ill. 306; Scammon v. Chicago, 42 Ill. 192; Parmelee v. Chicago, 60 Ill. 267; Dyer v. Harrison, 63 Cal. 447; 15 Am. & Eng. Ency. of Law, pp. 1068, 1069; Brown v. Gates, 15 W. Va. 131; Birmingham v. Rumsey, 63 Ala. 352; Hart v. New Orleans, 12 Fed. 292; Davenport v. Ins. Co., 17 Iowa, 276. (6) The principle adopted as to value and damages was erroneous, and the value allowed for the property taken was very excessive. Jamison v. Springfield, 53 Mo. 232; Springfield v. Schmook, 68 Mo. 394; Bridge Co. v. Ring, 58 Mo. 491; Doyle v. Kansas City, 113 Mo. 280; McReynolds v. Kansas City, 110 Mo. 484; Bowman v. Ross, 167 U. S. 548, 574; Dillon on Mun. Corp., secs. 632, 624; Randolph Law Eminent Domain, sec. 234, citing 98 U. S. 403; Lewis Eminent Domain, sec. 478, citing 58 Mo. 491. (7) The damages, outside of the value of the land taken, allowed to Mr. Brown, were illegally assessed. McMahan v. Railroad, 41 La. Am. 827. (a) The city charter allows only the value of the premises taken and the actual damage done to the property thereby. Cases under the Revised Statutes of the State are not applicable. Chicago v. Taylor, 125 U. S. 161. (b) The whole beneficial interest in land consists in the right to take the rents and profits therefrom. Coke Littleton, 45; Pollack v. Trust Co., 157 U. S. 581; 1 Jarman on Wills (5 Ed.), p. 597. (c) The value of his property allowed Brown included his right to rents and profits. City of Kansas v. Morris, 105 Mo. 510; Randolph Eminent Domain, sec. 241; Boaz v. Boston, 136 Mass. 390; Slattery v. St. Louis, 120 Mo. 187. (d) The action of the commissioners in allowing Brown a sum as rental value of his land for his loss prior to the judgment of condemnation was erroneous. Missouri Constitution, art. 2, sec. 21; Hickman v. City of Kansas, 120 Mo. 110. (e) From the time of judgment of condemnation interest accrues. Martin v. St. Louis, 139 Mo. 246; Plumb v.

City of Kansas, 101 Mo. 525.   (f)   Liability of the city to
Brown can not be affected by the length of time occupied by
him in the erection of a new building.   Bowles v. Boston, 136
Mass. 398; Lincoln v. Scranton, 162 Pa. St. 289; City of
Kansas v. Morris, 105 Mo. 510.   (g)   The cost of removing
Brown's house has nothing to do with the measure of damages.
City of Kansas v. Morris, 105 Mo. 510; Williamson v. Com.,
47 N. E. 115.   (h)   The fact that Brown removed his house
in anticipation that the land would be taken constitutes no
element of damage.   Funk v. St. Louis, 122 Mo. 132; Bush
v. McKeesport, 166 Pa. St. 57; Dillon on Mun. Corp., secs.
587D, 516 note.   (i)   Brown's removing his building was
voluntary and the city cannot be held to pay resulting damage.
White v. City of Kansas, 22 Mo. App. 409; Simpson v. Kansas
City, 111 Mo. 237; State ex rel. v. Hugg, 44 Mo. 116.   (8)
The charter and ordinances under which this proceeding was
had violate the Fourteenth Amendment of the Constitution of
the United States.   Village of Norwood v. Baker, 172 U. S.
269; McCormick v. Patchen, 53 Mo. 33, 36.

   *B. Schnurmacher* and *Chas. Claflin Allen* for respondent,
City of St. Louis.

   (1)   Property belonging to the city of St. Louis regard-
less of its character or use, is not liable to special taxation or
local assessments, which are but an exercise of the taxing
power.   2 Dillon's Mun. Corp., secs. 576, 577; Elliott on
Roads and Streets, pp. 403, 404; Clinton v. Henry County,
115 Mo. 557; Worcester Co. v. Worcester, 116 Mass. 193;
Lowe v. Board, etc., 94 Ind. 553; Leonard v. Brooklyn, 71
N. Y. 498; Hartford v. Middle School District, 45 Conn.
462; Polk County Savings Bank v. State, 69 Iowa, 24; Sioux
City v. Sioux City School District, 55 Iowa, 150.   (2)   The
evidence shows that one piece of property belonging to the
city, and embraced in the taxing district, is under lease to one

Louis C. Bohle. The evidence also shows that the rent received by the lessee is paid into the general Municipal Revenue Fund. Since, therefore, the income derived from the property is devoted to general municipal purposes, it is immaterial that the city does not occupy the property directly. North St. Louis Gymnastic Society v. Hudson, Collector, 12 Mo. App. 342; s. c., 85 Mo. 32; People v. Brooklyn Assessors, 111 N. Y. 505.

*Silas B. Jones* for respondent Brown.

(1) In a condemnation cause a party has no right to complain of errors alleged to have been committed against any other person to the proceeding than himself; nor has an appellant a right to a reversal of the judgment of the lower court for alleged errors therein, which do not affect him. Kansas City v. Smart, 128 Mo. 293; St. Louis v. Lanigan, 97 Mo. 180; Mead v. Brown, 65 Mo. 554. Such proceeding is an action at law; and the appellate court will not interfere with the report of the commissioners therein by weighing the evidence on which it is founded; nor will the appellate court set aside the report of the commissioners, except where mistake, fraud, prejudice or passion manifest themselves in its rendition; and unless the appellate court is clearly satisfied that the commissioners have erred in the principles, upon which they have made their appraisal of values, damages and benefits, there is nothing for review, and the report will not be disturbed. Kansas City v. Bacon, 147 Mo. 279; St. Joseph v. Crowther, 142 Mo. 162; Kansas City v. Smart, 128 Mo. 297; St. Louis v. Lanigan, 97 Mo. 178; Kansas City v. Baird, 98 Mo. 218; Kansas City v. Butterfield, 89 Mo. 648; Railroad v. Dennis, 67 Mo. 440; Railroad v. Campbell, 62 Mo. 589; Railroad v. Almeroth, 62 Mo. 343; Railroad v. Richardson, 45 Mo. 468; Kansas City v. Street, 36 Mo. App. 666; Railroad v. Cox, 41 Mo. App. 502; Garland v. Smith, 127 Mo. 579; Railroad v. Ring, 58 Mo. 495; St. Joseph v.

Geiwitz, 148 Mo. 216.    (2)    Where by a condemnation proceeding a part only of the citizen's property is taken, and thereby his business conducted upon his whole property is necessarily suspended and requires readjustment to the new order of things before it can be again successfully prosecuted, he is entitled to have the commissioners take into account and to compensate him for (a) the value of the naked land actually appropriated; (b) the loss of appliances in and arrangements of his property appropriate to his business; (c) the reasonable expense he is necessarily put to in the readjustment of his property remaining after the appropriation, so as to reasonably adapt it to the changed condition; and (d) the actual loss that he sustains by the necessary suspension of his business caused by the appropriation of a part of his property and the readjustment of the remainder to the new conditions.    Railroad v. McGrew, 104 Mo. 282; Bridge Co. v. Schaubacher, 57 Mo. 582; Union Elevator Co. v. Railroad, 135 Mo. 353; Patterson v. Boston, 23 Pickering, 425; Railroad v. Capps, 72 Ill. 188; Railroad v. Hock, 118 Ill. 587; Sherwood v. Railroad, 21 Minn. 127; Commissioners v. Moesta, 91 Mich. 149; Railroad v. Napierville, 166 Ill. 87, 92, 93.    (3)    The city charter prescribes the qualifications of the commissioners to assess the values, damages and benefits, by providing for the appointment of three disinterested freeholders of property in the city for that purpose.    Charter, art. 6, sec. 4.    By disinterested freeholder is meant one whose pecuniary interest will not be directly affected by the establishment or refusal to establish the contemplated highway. Kundinger v. Saginaw, 59 Mich. 355; Railroad v. Barnes, 40 Mich. 385; State v. Cran, 36 N. J. L. 397; Wilbraham v. Commissioners, 11 Pickering, 322; Mills, Em. Dom. (2 Ed.), sec. 227.    The interest which will disqualify one to act as commissioner must be more than that of a mere taxpayer in the municipality, which is a party to the cause, and which must be assessed with a part of the cost of the improvement. Minneapolis v. Wilkin,

30 Minn. 142; Phillips v. Commissioners, 122 Mass. 260; Wilbraham v. Commissioners, 11 Pick. 322; Mills Em. Dom., sec. 227; 7 Ency. of Pl. and Pr., p. 552. The interest or partiality which will disqualify one to act as commissioner in a condemnation cause must relate to the duties which he will be called upon to discharge as a commissioner. Lexington v. Long, 31 Mo. 369; Readington v. Dilley, 24 N. J. L. 213. (4) The assessment of private property for special benefits accruing thereto from local public improvements is referred to and sustained under the taxing power of the state. Garrett v. St. Louis, 25 Mo. 505; Keith v. Bingham, 100 Mo. 306. It is a tax upon the benefits. Garrett v. St. Louis, 25 Mo. 513. The power of local taxation for public improvements is put upon the ground of compensation, for the reason that the property assessed is especially benefited and enhanced in value to the extent of the assessment. Kansas City G. Co. v. Holden, 107 Mo. 305; Lockwood v. St. Louis, 24 Mo. 20. Statutes providing for the levy of taxes, whether for revenue or as assessments for special benefits accruing to property from public improvements, are not to be construed to apply to property belonging to the State at large, or to any municipality of the State, unless such property is expressly named therein, or intended by necessary implication. Clinton v. Henry County, 115 Mo. 557; Connecticut v. Hartford, 50 Conn. 89; Commissioners v. Board of Managers, 62 Md. 127; Bank v. Iowa, 69 Iowa, 24; Worcester Co. v. Mayor, 116 Mass. 193; 2 Dillon, Mun. Corp. (4 Ed.), sec. 773 et seq.

VALLIANT, J.—This is a condemnation proceeding to widen a part of Twelfth street in the city of St. Louis.

In 1898, Twelfth street from Market street northward to St. Charles street, was 150 feet wide, from St. Charles street north it was 80 feet wide. The next street north of St. Charles, crossing Twelfth, is Washington avenue, it being a solid block from the one street to the other. The defendant

Brown owned a lot extending from St. Charles street to Washington avenue having a front on each of the three streets, that is, about 200 feet on Washington avenue and St. Charles each, and 150 feet on the east side of Twelfth street. The purpose of this suit is to widen Twelfth street from St. Charles to Washington avenue, so as to carry the width of 150 feet to that point; to do this it was necessary to cut off 35 feet and 4 inches from the west end of Brown's lot, by running a new east line of Twelfth street through his lot from St. Charles to Washington avenue, 35 feet and 4 inches east of the old east line of Twelfth street, and also cutting off from lots of other parties on the other side of that street. An ordinance of the city authorizing this proceeding was approved February 12, 1898.

At the time this ordinance was approved defendant Brown had entered into contracts under which a large steel and brick mercantile building was to be erected on the lot which he had already contracted to lease to responsible firms as soon as it should be completed. The building has since, with the change as to location presently to be noted, been completed, at a cost, including equipment, of about $325,000. At the date of the ordinance the excavation for the building had been made, some retaining walls, etc., constructed, and the work was ready to progress under the contracts. When the ordinance was in the course of its passage, and when it was in the hands of the mayor for his approval, the defendant Brown exerted all the influence at his disposal to defeat it and in this he had the co-operation of some of the appellants in this case. But when the ordinance was signed by the mayor, Brown adjusted the proposed building to the emergency, and moved its site back 35 feet 4 inches east from the old line of Twelfth street, and it was then erected, leaving the 35 feet 4 inches to be taken by the city according to the exigencies of the ordinance. If the building had been erected on the original site it would have left Brown a vacant lot adjoining on the east, of 70 feet front

on Washington avenue and St. Charles street, for other purposes, but when this change was made it reduced the adjoining lot to 35 feet front.

These condemnation proceedings were commenced in due form on the 24th of February, 1898; after process was served on the defendants on April 6, 1898, commissioners were appointed by the circuit court, who after being sworn, entered upon the duties of their office, and on Novembtr 11, 1898, filed their report wherein it appeared that the total amount of damages awarded · all the defendants· in the case was $293,150.93, of which they assessed against the city $102,602.85, and the balance $190,548.08 against private property included in the benefit district. Of these damages the commissioners awarded $159,563.18 to defendant Brown, and assessed him $33,377.50 of the benefits; to defendant Conzelman, who owned property on the other side of Twelfth street they awarded $96,619 damages, and to defendant Blell also on the west side of the street, $36,968.75 damages, and assessed him with $8,041.66 as his share of the benefit.

In awarding the damages to defendant Brown, the commissioners estimated not only the value of the land actually taken, but also the expense he was put to in moving the site of his building to conform to the city's demand, and the delay occasioned thereby in the completion of the house and the injury to the remaining lot consequent on its reduction in size.

The commissioners laid out a large benefit district over which they distributed their benefit assessments, many of the owners of property in which district filed exceptions to the report, all of which were heard and overruled by the court, and those exceptors are appellants here.

The foregoing statement is the case in general outline, the more particular details necessary to be considered will be mentioned in connection with the several points advanced by the counsel in their briefs.

I.  Appellants say there was no necessity for widening Twelfth street.  In this opinion they seem to have had the concurrence of defendant Brown, who united his efforts with those of the appellants in an endeavor to prevent the passage and approval of the ordinance.  Public costly improvements are not infrequently opposed by those at whose immediate expense they are to be made, and would often be defeated if left alone to their decision.  The desire in such matters often controls the judgment, so that such improvements are frequently made against the will of those immediately to be affected. The determination of such matters, however, is not left to them, but to a presumably more disinterested body, and in this instance the power is in the municipal assembly and the mayor, and its exercise is intrusted alone to their judgment.  Whether or not the purpose of the ordinance is good policy is a question for the ordinance-making power of the city government, and the courts have no review of it.

When it is proposed to take private property for public use, the individual affected has a right to challenge in court the character of the use proposed, and the court will determine whether it be or be not a public use.  That is to say, whether or not the use proposed is in its nature a public use, is a judicial question, but whether or not the exercise of the authority in the particular case is expedient or politic is a question for the legislative and executive departments of the city government.  [Lewis on Em. Dom., section 158.]  A good deal of testimony on the part of exceptors was designed to show that the widening of the street was a mere aesthetic idea and of doubtful policy, but with that subject we have nothing to do.

II.  It is contended that one of the commissioners, Hummelman, was not a disinterested judge in the matter, and that for that reason the report should be set aside.  This is a serious charge and the proposition of law on which it is founded needs no citation of authorities to sustain it.

The testimony on which the exceptors rely to sustain this charge is that of the commissioner himself, who was called as a witness by some of the exceptors, and who on that point testified in effect that he was individually opposed to the scheme of opening Twelfth street for the reason that whilst he thought it a public benefit, yet in the condition of the city treasury, he thought that the money required for that purpose could be better used in other directions; that when the ordinance was in the mayor's hands, at the request of Mr. Gehner and Mr. Jones, who was attorney for Mr. Brown, he interested himself to try to have it vetoed; that in furtherance of this object he visited the office of Mr. Collins, one of the attorneys for the Lindell Real Estate Company and other exceptors who were opposing the measure, and conferred with him as to the line of argument to be presented to the mayor; at that time he was not acquainted with Mr. Brown, met him first during the sessions of the commission; that after the report of the commissioners was filed in court, after having looked over the exceptions in which it was charged that the city ought to be assessed a larger proportion for the benefits of the public, the witness appeared before the committee of the city council having the matter in charge, and there heard some of the committee say that the city was assessed too much, whereupon he told the committee that in his opinion it was only a question for them to say whether or not the city's assessment was too high. The witness was asked if he had not stated to Mr. Collins upon the occasion above referred to, when he called at his office, that he had been employed by Mr. Jones to represent Mr. Brown in the matter before the mayor to which he answered that he did not think that he had. Mr. Collins was then called as a witness by the exceptors for the purpose of impeachment, and over the objections of defendants, stated that upon the occasion referred to Mr. Hummelmann had said that Mr. Jones had employed him to represent Mr. Brown before the mayor. The above is substantially all there was to

sustain the charge that this commissioner was not disinterested.
The trial court very correctly decided that the charge was not
sustained. In the first place, if he had been employed by
Brown for that purpose, it was a purpose which Brown had
in common with the exceptors, that is, to defeat the scheme,
and their united efforts were in the same direction. But the
evidence does not show any such employment. It must be
observed that the exceptors had themselves called Hummel-
mann as their witness on other questions in the case, and hav-
ing obtained his evidence on points that suited them they had
no right to impeach him as a witness. Besides if he had said
what Mr. Collins thinks he said, or if Mr. Collins correctly
understood what he intended to say it would amount to noth-
ing as against the defendants in this case, they would not be
bound by an admission that Hummelmann may have made.
The fact is, he went before the mayor at the request of Mr.
Brown's attorney, and it is very likely he said so to Mr. Col-
lins, and he may have used a form of expression that would
indicate that he was employed to do so. But it is very easy to
misunderstand a meaning or fail to distinguish a shade of
meaning in a casual remark like that. Mr. Hummelmann, it
seems, as a citizen, was opposed to this movement. A large
sum of public revenue was to be devoted to a purpose which
he did not approve, and when a party to be immediately af-
fected, believing that he had influence with the mayor asked
him to aid in defeat of the measure, he consented and did
what he could. But when the mayor signed the ordinance
that was the end of the question as to public policy. The
questions arising after that were entirely new issues, which a
man otherwise qualified would not be disqualified because of
his attitude towards the ordinance when it was a matter *in
fieri.* In this connection, too, we must not forget that al-
though the exceptors who are represented by Mr. Collins
were not in court when the commissioners were appointed, and
therefore could not have objected, yet they were in court con-

structively, after publication, and apparently in fact early in the sessions of the commissioners, and if they had any valid objection to urge against a commissioner they should have made it as soon as they could. They should not have waited until they have seen the result of the commissioners' judgment and then object.

III. The charter provides: "It shall be the duty of the commissioners to ascertain the actual value of the land and premises proposed to be taken, without reference to the projected improvement and the actual damages done to the property thereby, and for the payment of such values and damages to assess against the city the amount of the benefit to the public generally, and the balance against the owner or owners of all property which shall be especially benefited by the proposed improvement in the opinion of the commissioners, to the amount that each lot of said owner shall be benefited by the improvement." [Art. 6, sec. 5, Charter of St. Louis.]

The city ordinance prescribes the duties of the commissioners in the same words down to the clause directing the assessment of benefits, when it uses this language: "And the balance against all property within a district to be ascertained, defined, laid down and established by the commissioners as the district of property benefited by the proposed improvements; and each lot in said district shall be assessed for the proportionate amount it is benefited in the opinion of the commissioners, so that the aggregate amount assessed against the property in said district shall equal the amount of value and damages awarded for the property taken for the improvement less the amount assessed against the city for the benefit arising to the public generally for the improvement......provided further, that before the commissioners shall assess benefits against property in the district established as aforesaid the city counselor shall give five days' notice in the papers doing the city printing of the establishment of said district and the boundaries thereof, and of the time and place when and where

the commissioners will proceed to assess said benefits, and inviting all persons interested to be present; and at said hearing all parties owning or interested in property in said district shall have the right to be heard, and may except to the report of the commissioners before the circuit court when filed." [R. O. St. Louis 1892, section 675.]

When the commissioners began their labors in this matter they marked out a district to be assessed for benefits, and the city counselor caused the notice to be published required by the ordinance and parties interested who desired to be heard came before the commission. But upon final hearing the commissioners reduced the size of the district as originally marked out, omitting a considerable portion of it from the assessments of benefits finally made.

This is one of the serious complaints that the exceptors make against the action of the commission. It calls for a construction of the ordinance above quoted in connection with the charter provision. The charter, which is the higher law of the two, directs that these benefits shall be assessed "against the owner or owners of all property which shall be specially benefited by the proposed improvement in the opinion of the commissioners." The ordinance merely directs the mode of procedure for the commissioner. It is true the ordinance directs the establishment of a district and afterwards that notice be given. But if it means that the district is to be unchangeably fixed in the first place it requires a very important point to be decided before the parties interested are afforded an opportunity to be heard. A man whose property is included in the proposed district is entitled to be heard not merely on the amount of his assessment, but as to his liability to be assessed at all, and if after the hearing, the commissioners should conclude that his property is not benefited they should not assess it. And on the other hand, if the parties notified appear and demonstrate to the commissioners that the district is too small, their powers would be very inade-

quate if they could not extend it and cause notice to be given to property owners within the new proposed bounds.    The direction in the ordinance in reference to the notice to be given is in the form of a proviso which qualifies all that has gone before.    The charter requires the benefits to be assessed against all the property benefited in the opinion of the commissioners, and excludes the idea that any other property is to be assessed; the ordinance can not enlarge or take from that requirement, and is not to be interpreted as designed to do so. It does not mean that.    There is no decision of the commissioners that is irrevocable by them until they file their report in court.    They must proceed in the manner pointed out by the statute, and lay out and define the benefit district, but until their decision is finally made and returned into court in the shape of their report filed, the district may be altered as further light and maturer reflection may convince them is right and just.

IV.    Included within the boundaries of the district designated by the commissioners as especially benefited, are three pieces of property belonging to the city against which no benefits are assessed.    This is one of the exceptions insisted on.    On two of these pieces of property are located the city hall, The Four Courts and jail, and on the third is the old city hall, still used to some extent for the public offices of the city, but a part of the lot is leased to one Bohle, who has on it a livery stable, the rents for which go into the general revenue of the city, and the whole lot is to be sold under an ordinance, passed in 1895 for that purpose, and the proceeds to be used in the completion of the new city hall.

The questions as to the liability of property belonging to counties and cities, to taxation, was discussed in City of Clinton to use v. Henry Co., 115 Mo. 557.    It was there held that the constitutional provision exempting such property from taxation applied only to general taxes, and not to special assessments to pay for street improvements; that as to the

latter, such property was subject to the will of the Legislature. In the further discussion of the subject, Judge BLACK, for the court, in that case, said: "In the next place it is a general rule of law that where, as here, the statute creates a new right and prescribed a remedy, the statutory remedy is exclusive." And in the same opinion (l. c. 570), it is said: "According to these adjudications, proceedings to enforce special tax bills are in the nature of proceedings *in rem*, and compulsory payment of the judgment can only be by sale of the assessed property. As public property like that here in question can not be sold on general or special execution, and as the legislature has provided no other remedy than that of enforcement of the lien, it is quite evident that the statute in question does not apply to or include property owned by a county and used for governmental purposes."

The principle to be deduced from that decision and applied to this case is, that whilst it is competent for the law making power to include public property belonging to a city or county within the limits of special assessments for public improvements, yet such property is not so included, unless it is so by express enactment or clear implication, and where the only remedy for the collection of the tax provided by law is of a character inapplicable to such property the court can not provide a remedy, but must conclude that the lawmakers did not intend such property to be affected by the act. To the same effect also is Inhabitants v. Mayor, 116 Mass. 193. Under the charter provision in question, the assessment is made a lien on the property affected, and the only remedy is by enforcement of the lien. If the lawmakers had intended to include property belonging to the city, it would have either been so expressed, or else the mode of payment would have been specified.

The fact that a small portion of the property for the time being is leased to Bohle, does not affect the principle. The

VOL. 155 mo—36

property is not included in the assessment, because it is owned by the city. The law in such case makes no provision for the sale of Bohle's interest. It provides that the assessment shall be a lien on the land, and the remedy is reached through a proceeding *in rem*.

The commissioners have assessed against the city as the law requires them to do, the proportion of the damages awarded the defendants which represents the benefit to the general public that is to be paid out of the general revenue of the city. If in adition to that they had assessed the city's property as for benefits, that assessment, if lawful, would also have to be paid out of the city's general revenue or else the property be sold and thus the general revenue would bear a greater proportion of the burden than the law directs. The circuit court correctly ruled on that point.

V. It is insisted that the commissioners included in their estimate of defendant Brown's damages over-estimates in the value of his property taken and elements not proper to be included.

The language of our Constitution is: "That private property shall not be taken or damaged for public use without just compensation. Such compensation shall be ascertained by a jury or board of commissioners of not less than three freeholders, in such manner as may be prescribed by law; and until the same shall be paid to the owner, or into court for the owner, the property shall not be disturbed, or the proprietary rights of the owners therein divested." [Art. 2, sec. 21.]

If we will take our Constitution at its word and give effect to it according to its plain meaning we can have no difficulty in determining the proper measure of damages in such case. Courts lay down general rules for the guidance of the jurors and commissioners which are sometimes serviceable, but any rule that may be laid down must itself be measured by the rule given in the Constitution, and any rule that so limits the damage in such case as that the result will

be in fact less than just compensation for the injury suffered, falls short of the constitutional measure. Such has been the ruling of this court whenever it has spoken on the subject.

In Hannibal Bridge Co. v. Schaubacher, 57 Mo. 582, the defendants owned two lots separated by an alley, on the west lot was their brewery, on the east was a malt house, horse-power pump and pipe through which passing under the surface of the alley, the brewery was supplied with water. The plaintiff condemned and took the east lot, and contended that the value of that taken was all that it was required to pay for. The court, per WAGNER, J., said: "This by no means confines the assessment to the land actually taken. That may constitute the smallest amount of the injury done. There may be consequential damages which result by reason of the appropriation fairly comprehended within the scope of the law, and this case furnishes a strong illustration. Such is the construction placed on similar statutes in other States." Then quoting with approval from Parker v. Railroad, 3 Cush. 107, as follows: " 'We are of the opinion, therefore, that a party who sustains an actual and real damage, capable of being pointed out, describing and appreciated, may sue a complaint for compensation for such damages.' " And this court after further discussion concludes as follows: "This then, we are inclined to think, would be the proper and appropriate measure of damages, viz.: the cost and expense of removing the malt house, horse-power pump and pipe to the west of the alley, so that they would be used as effectively and advantageously for running the brewery as it was run before, to which should be added compensation for the use of the brewery for what time it would have been necessarily idle whilst the change and transfer were being made."

In Chicago, etc., Ry. Co., v. McGrew, 104 Mo. 282, the land condemned contained a coal mine with its machinery, etc., for its operation. The court, per MACFARLANE, J., said: "The damages to be paid are to compensate for the injury to

the whole of the property as it was left, at the time the appropriation was made, in view of the uses to which the land appropriated was to be applied......It is evident that damages to the property should not be confined to the surface of the land, and the machinery in use in the business, but should also apply to the internal arrangement of the mine, and the appliances therein provided for its economical and success-ful operation, and to all external arrangements which add to its value. If the shaft, in use when the condemnation was made, could no longer be used, the damage would not be con-fined to the loss of the shaft but should include such damage to the internal arrangement of the mine as would result from the necessary abandonment of any part of such appliances, or their readjustment to necessary changes......It is the duty of one, sustaining damages by reason of the act of another, to use all reasonable exertion to protect himself and avert, as far as practicable, the injurious consequences of such act. [Doug-lass v. Stephens, 18 Mo. 366; Waters v. Brown, 44 Mo. 303; 1 Sutherland on Dam., 148.] It was, therefore, the defend-ant's duty to adjust his property to its changed condition as soon as it could reasonably be done, and in such manner as would avert such damages as could be avoided by reasonable endeavors and expense......If the business of the defendant was necessarily interrupted, by reason of the appropriation of a portion of his land, compensation should have been allowed for the reasonable value of the use of the mine during the period of such necessary interruption."

In C., B. & Q. Railroad v. Naperville, 166 Ill. loc. cit. 92, that court said: "Where land is taken for a public use the Constitution and the statute require that just compensation shall be made to the owner. Unless the owner is made whole he would not receive the compensation which the Constitution guarantees him." Accordingly it was held that the defend-ant was entitled to damages for the increased cost and inter-ruption of its business, consequent on the opening of the

street, and the court adds: "This would seem too plain a proposition to consume time in its elaboration." The briefs of counsel are rich in authorities on this subject, but we have quoted sufficient. It was insisted in the argument and is still insisted in the briefs of the learned counsel for appellants, that whatever the requirements of the Constitution may be, these commissioners had no higher authority than the charter and the ordinance which it is argued, are more restrictive in their language than the Constitution. We think that is a misapprehension of the charter and ordinance. Those instruments were aiming to effectuate the purposes of the Constitution in the matter of taking private property for public use, to afford the public the streets and improvements that were required and to render just compensation to the individual property owner who was compelled to yield his private rights for the public good. The language employed in the charter and ordinance carries that meaning, and it is the correct interpretation. The plain requirement of the Constitution is the law of this case.

When this ordinance was approved defendant Brown's contracts were let for the construction of his building at the cost of $252,000. What was his duty under the circumstances? Should he have gone on with the construction and magnified the damages the city should pay him either with the determination to resist the enforcement of the ordinance, or with a view to make it as costly a proceeding as possible to the city? Or should he suspend all operations until the cause had been carried through the courts, and its result definitely known? Good faith and justice demanded, in the words of this court last cited, that he should use ".all reasonable exertion to protect himself and avert as far as practicable the injurious consequences of such act." If he should wait until it could be settled in court, it would deprive him for an indefinite period of the large capital invested in his enterprise. In either event he had to take the risk of the city's carrying

out its purpose, for even now the city can abandon the scheme. He took the most conservative and prudent course, gave faith to the city in carrying out its ordinance, and averted, as far as possible, the damages consequent on the city's act. He removed the site of his building eastward 35 feet 4 inches and proceeded with its construction. That move cost him just $7,813.86 for which the appellants say there can be no compensation. Moreover, the change delayed the completion of the building, for which he had tenants waiting at a fixed rental, and he lost by that delay $5,000. If he is to have no compensation here for that loss, then he is damaged to that extent by this act of the city, and he has no other redress. In the language of the Massachusetts case above cited, he "sustains an actual and real damage, capable of being pointed out, described and appreciated." This court said in the brewery case that in addition to other items of damages, the defendant should have "compensation for the use of the brewery for what time it would have been necessarily idle, while the change and transfer were being made." And in the coal mine case we said: "If the business of the defendant was necessarily interrupted, by reason of the appropriation of a portion of his land, compensation should have been allowed for the reasonable value of the use of the mine during the period of such necessary interruption."

On what principle, then, can we deny the defendant Brown compensation for the loss of the rent of his house and what it cost him to move it, the figures for both of which he has shown by unquestioned proof?

The defendant Brown had a lot 70 feet front on Washington avenue, and St. Charles street, east of and adjoining the lot on which his building was to have been erected according to the original plan, but when this building site was moved 35 feet east, it occupied 35 feet of that 70 foot lot and left only a 35 foot lot. The commissioners estimated that a lot 70 feet front, situated as that was, was worth more than twice as much

as a lot of 35 feet front, and allowed the difference in defend-ant's damages. There is nothing unreasonable in that proposi-tion. In a vicinity of large mercantile buildings designed for great wholesale establishments, it does not require much ex-pert evidence to convince one that the value per front foot of such a lot may be greatly influenced by the size of the lot. The commissioners seem to have been satisfied that that was the condition here, and we find no fault with the court's rul-ing in sustaining that view.

As to the value of the land taken there was sufficient and satisfactory evidence to sustain the award of the commis-sioners. On a mere question of value depending on conflict-ing evidence the circuit court should hesitate to interfere with the commissioners' finding, although in a proper case it has undoubtedly the right and duty to do so. A board of commis-sioners is the tribunal provided by our Constitution to do jus-tice in such cases between the city and the citizen. They are selected by the circuit court and should be men of good judg-ment and honest repute. They have an advantage that the court and even a jury do not have in trying a case, they go upon the land and make a personal observation and study of it and its surroundings, besides they have the benefit of such evidence as parties see fit to bring before them. Assuming, as we must, until the contrary is shown, that the commissioners have given the subject their best, careful and conscientious consideration, their finding on a mere question of value is en-titled to great weight with the trial judge when he is hearing exceptions to their report. We see nothing in the award of damages to the defendants, that would justify us in holding that the trial court committed error in overruling the excep-tions on that ground.

VI. The last point advanced by the appellants is that the city ordinance under which this commission acted is in violation of the Fourteenth Amendment of the Constitution of the United States.

Although the exceptions filed in the circuit court specified many grounds for which the exceptors thought the report of the commissioners ought to be set aside, yet this was not one of those grounds. There was no point made in the trial court that the Constitution of the United States was being violated, and there is nothing in the point as it is now for the first time here presented.

To say that the commissioners in this case acted arbitrarily and not in accordance with the course pointed out for their guidance by law is not, we think, justified by the evidence.

We have considered all the points advanced in the briefs of the learned counsel for the appellants and we have found no error in the record.

The judgment of the circuit court is affirmed. *Brace, P. J.,* and *Robinson, J.,* concur; *Marshall, J.,* not sitting, having been of counsel.